IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-7084

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN JACKSON and GENARO CAMACHO,

Defendants-Appellants.

_____

Appeal from the United States District Court for the
Northern District of Texas

_____

(November 23, 1992)

Before POLITZ, Chief Judge, JOHNSON, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this appeal, Juan Jackson and Genaro Ruiz Camacho contest their convictions for the kidnapping of Evellyn Banks and her three-year-old son Andre. The kidnapping arose out of a drug transaction and it ended in the cold-blooded murder of Evellyn and Andre Banks.

Camacho asserts that the district court reversibly erred when it denied him a forty-five day continuance. It further erred, he says, when it allowed the government to introduce evidence of an earlier kidnapping. He contends additionally that the government failed to timely disclose <u>Brady</u> material. Jackson argues that the

evidence was insufficient to establish kidnapping under federal law because he could not reasonably foresee that the victims would be transported in interstate commerce.

Both defendants argue that they were improperly denied access to the presentence reports of their co-defendants. Both defendants also urge that the court incorrectly sentenced them under the guideline for murder and ordered them to pay restitution in an amount that is unrelated to the losses of their victims.

Finding no merit in the bulk of the defendants' arguments, we affirm their convictions and their sentences. However, we reverse and remand the restitution orders for both Jackson and Camacho because the district court did not support its orders with factual findings.

I

On May 20, 1988, Genaro Ruiz Camacho enlisted the aid of Juan Jackson and several others to collect a debt that Sam Junior Wright owed him as a result of a drug-related transaction. The men went to Wright's home in Pleasant Grove, Texas, which he shared with Evellyn Banks, their three and a half year old son Andre Banks, and Evellyn's two school aged children. The two older children were at school. Camacho insisted that Wright owed him between $10,000 and $20,000, and demanded that Wright pay him. Wright had $1,500, which he gave to Camacho. Camacho was not satisfied. He and his fellow defendants, who were all armed, proceeded to terrorize their captives.

David Wilburn, a young, retarded man who worked for Wright, interrupted the kidnappers when he knocked on the door. Camacho told Wilburn to come in, searched him and made him lie flat on the floor. Wilburn was not armed and offered no resistance. Camacho, without warning or provocation, shot and killed Wilburn.[1]

Turning his attention back to Wright, Camacho asked him when he could get the money. When Wright replied in a couple of days, Camacho demanded to know how he would get the money. Wright told Camacho he would sell his house and his car. Camacho replied that he would kill Evellyn and Andre if Wright failed to pay him. Camacho then ordered the other defendants to handcuff Evellyn and Andre and put them in the car. At this point, Wright managed to escape the house and yelled to a neighbor to call the police. The kidnappers chased Wright around the block. Camacho ordered Jackson to shoot him. Jackson did not comply.

The kidnappers took Evellyn and Andre to an apartment in Dallas that several of the defendants shared. While two of the other defendants watched Evellyn and Andre, Jackson and another defendant counted and split the money. A few hours later, Jackson left with his share of the money and never returned. The kidnappers kept them there for two days. On May 22, Camacho and the other defendants decided to take Evellyn and Andre to Oklahoma to kill them because they had witnessed the murder of Wilburn and

_____

[1]The state tried and convicted Camacho for the murder of David Wilburn and sentenced him to death.

-3-

could provide evidence to the police if released.  That evening, they took Evellyn and Andre to Ardmore, Oklahoma, and the next morning, they took them to a location near Arbuckle National Forest.  There the kidnappers killed their victims and buried them in a pre-dug grave.  The autopsies of the bodies revealed that the kidnappers shot Evellyn in the head twice and that they shot Andre in the head four times.

At trial, the government introduced evidence of a prior kidnapping incident involving Jackson and Camacho.  In that incident, the men had driven to Wichita, Kansas, to collect a debt owed to Camacho.  Not finding the debtor, they kidnapped his sister-in-law and brought her to Dallas until the debt was paid a few days later.  After obtaining the money, they released the woman and gave her a plane ticket back to Kansas.

II

On October 6, 1988, the United States charged Jackson and Camacho in a seven-count indictment with: (1) knowingly and willfully conspiring to kidnap Evellyn and Andre Banks in interstate commerce; (2) knowingly and unlawfully kidnapping and transporting Evellyn and Andre Banks in interstate commerce; and (3) willfully and unlawfully carrying and using a firearm during the commission of a felony.  On February 27, 1991, the United States returned a virtually identical indictment that only deleted counts that pertained solely to a few co-defendants who had plead guilty, and who had agreed to testify against the defendants.  In

-4-

the meantime, the State of Texas tried and convicted Camacho on a charge of capital murder.

On March 6, 1991, the district court entered an order setting this case for trial on May 6. Camacho filed his first motion for continuance on April 12. The district court granted the requested continuance and set the case for trial on its June docket. On June 12, Camacho again moved for a continuance. Camacho requested a forty-five day continuance, but the district court granted a continuance for only seven days.

From June 24 to July 9, 1991, the United States tried Jackson and Camacho before a jury in the United States District Court for the Northern District of Texas, Dallas Division, with the Honorable A. Joe Fish presiding. On July 9, the jury returned a verdict finding Camacho guilty on all counts, and finding Jackson guilty on all but one count. The district court gave both defendants life sentences under the sentencing guidelines for murder. The court also ordered Camacho to pay the estate of Evellyn Banks $1,000,000 in restitution, and Jackson to pay $250,000 in restitution. Both defendants moved for new trials, and when the district court denied those motions, they filed timely notices of appeal. These appeals followed.

III

A

We begin with Jackson and Camacho's contention that the district court improperly denied them access to the presentence reports of their co-defendants.

Prior to trial, Jackson filed a motion requesting all exculpatory evidence, including a copy of any federal or state probation or presentence report of any prospective government witness. The district court denied the motion pursuant to Rule 32(c)(1) of the Federal Rules of Criminal Procedure and United States v. Trevino, 556 F.2d 1265 (5th Cir. 1977). Both Camacho and Jackson now contend that the Jencks Act, 18 U.S.C. § 3500, required the government to produce the presentence reports of their co-defendants and that the district court erred in denying them access to the material.

The Jencks Act provides that upon a defendant's motion to a district court, the court shall "order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). The Act defines written statements subject to the Act as a statement made by the witness that the witness has "signed or otherwise adopted or approved." 18 U.S.C. § 3500(e)(1).

A presentence report, on the other hand, is not a statement made by the witness. Instead, it is a statement that a probation

officer makes to aid the court in sentencing a defendant. Once the probation officer makes the report, he gives a copy to the prosecution, the defendant, and the court. Pursuant to Rule 10.9(b) of the Local Rules of the Northern District of Texas, the defendant must either object to the statement in writing or adopt it. Assuming that their co-defendants in the instant case adopted their presentence reports, Jackson and Camacho argue that their co-defendants' presentence reports are adopted statements under the Jencks Act.

In _Trevino_, we held that the presentence reports at issue were not "in the possession of the United States," and, thus, not subject to the Jencks Act. At that time, Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure required the prosecution to return its copy of the presentence report to the probation officer after the court sentenced the defendant. We found that the "United States" meant the "prosecution" and concluded that the United States did not possess a copy of the report once the prosecution returned the report to the probation officer. _Trevino_, 556 F.2d at 1270-1272. We noted, however, that a "witness's presentence report held by the prosecution might thus be subject to Jencks Act production." _Id._

Under the current rules of criminal procedure, the prosecution retains a copy of the defendant's presentence report. As a result, we must face the question we avoided in _Trevino_: whether a defendant's presentence report is a statement within the meaning of

the term as it is used in the Jencks Act. Two other circuits have already concluded that presentence reports are not statements discoverable under the Jencks Act. <u>United States v. Moore</u>, 949 F.2d 68, 70-72 (2d Cir. 1991); <u>United States v. Dingle</u>, 546 F.2d 1378, 1380-1381 (10th Cir. 1976). Still other circuits, without regard to the Jencks Act, have held that the presentence reports of co-defendants are not discoverable unless the district court, after an in camera inspection, concludes that report contains exculpatory or impeachment material. <u>See</u> <u>United States v. De Vore</u>, 839 F.2d 1330, 1332 (8th Cir. 1988); <u>United States v. Cyphers</u>, 553 F.2d 1064, 1068-1069 (7th Cir. 1977).

We agree with the result these cases reach. A presentence report is not a statement made by a defendant; it is a report that the probation officer makes for the court. Under the local rules applicable in this case, a defendant must either object to the report or adopt it. Adopting the report under the local rules, however, is very different from adopting a statement under the Jencks Act. The purpose of the local rule is to prevent a defendant from objecting to the report after sentencing. Adopting a report under the local rules amounts to little more than failing to object to the report.

To adopt a statement under the Jencks Act, on the other hand, a witness must read the entire statement and formally approve the statement. <u>United States v. Newman</u>, 849 F.2d 156, 160 (5th Cir. 1988) (Witness did not adopt a DEA report when he told the DEA

agent that he did not disagree with anything in the report.) Otherwise, the witness could be impeached with a statement to which he did not agree.  Jackson and Camacho's co-defendants did not formally approve the statements in their presentence reports; they only interposed no objection to the reports.  Thus, they did not adopt their reports within the meaning of the Jencks Act.

Our decision that presentence reports are not statements under the Jencks Act is heavily influenced by the confidential nature of those reports.  Every court that has looked at this question has recognized that there is a need to protect the confidentiality of the information contained in the reports.  Accordingly, courts have required "some showing of special need before they will allow a third party to obtain a copy of a presentence report."  U.S. Dept. of Justice v. Julian, 486 U.S. 1, 12 (1988).  Indeed, defendants did not obtain the right to see their own presentence reports until 1975, almost twenty years after Congress enacted the Jencks Act. Id.

The defendants' inability to obtain the reports under the Jencks Act, however, does not end the matter.  The Supreme Court has held that the due process clause requires the prosecution to disclose all evidence favorable to the accused.  See Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972).  The Court reasoned that our system for the administration of justice "suffers when any accused is treated unfairly."  Brady, 373 U.S. at 87.  The Court concluded that the system treats a

defendant unfairly when it denies him access to favorable evidence. Id. It follows that a defendant ordinarily has a right to exculpatory or impeachment material that is contained in the presentence reports of his co-defendants. See Moore, 949 F.2d at 70-72, De Vore, 839 F.2d at 1332; Cyphers, 553 F.2d at 1068-1069. Because presentence reports are necessarily confidential, the district court should examine the report in camera and release any exculpatory or impeachment material to the defendant while protecting the confidentiality of the rest of the report.

In the case at bar, the district court examined the presentence reports at issue and found that: 1) the defendants already had access to all of the information the reports contained, and 2) the reports did not contain any evidence that was favorable to the defendants. The district court, thus, fulfilled its duty and afforded the defendants all the rights to which they were entitled.

B

Jackson also contends that the evidence was insufficient to support his kidnapping convictions because the government failed to prove that he transported the victims across state lines or that he knew, or could reasonably foresee, that his co-defendants would transport the victims across state lines. He further contends that we must reverse his conviction for the use of a firearm during the commission of a felony because the underlying kidnapping convictions cannot stand.

-10-

Jackson's arguments are ultimately unconvincing. The standard of review here is whether, based on all the evidence, a reasonable minded jury must necessarily entertain a reasonable doubt about the defendant's guilt. United States v. Gonzalez, 617 F.2d 104, 106 (5th Cir. 1980). The federal kidnapping statute provides that:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when: (1) the person is willfully transported in interstate or foreign commerce; . . . shall be punished by imprisonment for any term of years or for life.

18 U.S.C. § 1201(a). We have held that before a defendant can be found guilty of kidnapping under this statute "four elements must be established: 1) the transportation in interstate commerce 2) of an unconsenting person who is 3) held 'for ransom or reward or otherwise,' 4) such acts being done knowingly and willfully." United States v. McBryar, 553 F.2d 433 (5th Cir. 1977); see also United States v. McInnis, 601 F.2d 1319, 1324 n.11 (5th Cir. 1979).

Jackson argues that the government must establish that he personally transported the victims in interstate or foreign commerce. The evidence at trial showed that Jackson, Camacho, and the other defendants went to Wright's house, took $1,500, abducted Evellyn and Andre Banks, and moved them to another apartment in Dallas. At that point, Jackson took his share of the money and left. After Jackson left, Camacho and the other defendants moved the victims to Oklahoma and killed them. Jackson had parted company before the other kidnappers moved the victims to Oklahoma.

-11-

Thus, Jackson contends that the government failed to establish that he transported the victims across state lines, and, consequently, he cannot stand convicted under the federal kidnapping statute.

In support of this argument Jackson quotes language from two cases that appears to support his position. In a recent case, we held that:

> [t]o establish a violation of 18 U.S.C. § 1201(a)(1), the government must prove beyond a reasonable doubt that the defendant 1) knowingly and willfully kidnapped the victim; 2) held him for ransom, reward or other benefit; and 3) transported him in interstate commerce.

United States v. De La Rosa, 911 F.2d 985, 990 (5th Cir. 1990) (citing McBryar, 553 F.2d at 433). It is thus true that in De La Rosa, we inartfully restated the elements of kidnapping we announced in McBryar. Under our explication of the kidnapping statute set out in McBryar, however, the government does not have to prove that the defendant personally moved the victim in interstate commerce. Instead, the government only has to establish that the victim was transported in interstate commerce.

Jackson also relies on language in United States v. Bankston, 603 F.2d 528, 532 (5th Cir. 1979), where we found that "[s]o long as he [the defendant] `willfully transports' his victim and, in doing so, travels in interstate commerce, he need not do so knowingly." Jackson, however, ignores the very next sentence where we observe that "we have previously held that the `requirement that the offender cross state lines merely furnishes a basis for the exercise of federal jurisdiction and does not constitute an element

of the offense [of kidnapping].'"  Bankston, 603 F.2d at 532
(quoting United States v. Napier, 518 F.2d 316, 319 (9th Cir.
1975)); see also United States v. Barksdale-Contreras, 972 F.2d 111
(5th Cir. 1992) (We affirmed the kidnapping convictions of two
defendants who joined a conspiracy after the others had moved the
victim across state lines.  We held that the "transportation of a
kidnapped victim in interstate or foreign commerce is necessary to
establish federal jurisdiction.")

     In Bankston, Napier, and Barksdale-Contreras we recognized
that the transportation of the victim in interstate commerce is
jurisdictional and not an element of the crime.  This principle is
sound.  The plain language of the statute only requires that the
victim be "willfully transported" in interstate commerce.  It does
not require that the defendant move the victim or that the
defendant know that the victim will be moved in interstate
commerce.  In this case, the government proved beyond a reasonable
doubt that the victims were transported in interstate commerce.
That is all the statute requires.

C

     We now turn to Camacho's argument that the district court
erred when it denied his motion for acquittal.  Camacho contends
that there was a fatal variance between the indictment and the
evidence adduced at trial.  According to Camacho, although the
indictment charged one conspiracy to kidnap Evellyn and Andre
Banks, the government proved, not one, but two separate

-13-

conspiracies: one to kidnap Evellyn and Andre, and a second to murder them.

This argument is without merit. We will not reverse a conviction for such a variance in the evidence unless 1) the defendant establishes that the evidence the government offered at trial varied from what the government alleged in the indictment, and 2) the variance prejudiced the defendant's substantial rights. United States v. Richarson, 833 F.2d 1147 (5th Cir. 1987); Berger v. United States, 295 U.S. 78 (1935). In determining the whether the government proved a single conspiracy as charged, we examine the following factors: 1) whether there was a common goal, 2) the nature of the scheme, and 3) whether the participants in the various dealings overlapped. Richarson, 833 F.2d at 1153.

In this case, there is a common scheme that united all of the defendants' actions. Camacho and the other defendants conspired to kidnap Evellyn and Andre Banks. Although the reasons for kidnapping them may have changed, the object of the conspiracy-- kidnapping--remained the same. The defendants went to Wright's house to collect a drug debt. They recognized from the beginning that collecting the debt might require them to kidnap Evellyn and Andre Banks to hold them for ransom. While at Wright's house, Camacho killed David Wilburn. It then became necessary to cover up their involvement in the crime by killing the witnesses. This circumstance did not change the objective of the conspiracy; it only meant that the defendants now had an additional reason for

kidnapping the victims: eliminating the witnesses to the murder. Eliminating the witnesses after kidnapping them was only one aspect of the kidnapping conspiracy. Indeed, the members of the conspiracy worked together continuously, and their activities were guided by a single person, Camacho. We have found that where one man directs all the illegal activity there is one conspiracy. Richarson, 833 F.2d at 1154. Even if the conspiratorial crime established at trial varied from that which the government alleged in the indictment, the variance did not prejudice Camacho's substantial rights. See Berger, 295 U.S. at 82. We have long held that when the indictment alleges the conspiracy count as a single conspiracy, but the "government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." Richarson, 833 F.2d at 1155 (citing United States v. L'Hoste, 609 F.2d 796 (5th Cir. 1980)). Because the government proved Camacho conspired to kidnap Evellyn and Andre Banks, there was no variance that affected Camacho's substantial rights.

D

Camacho also contends that the district court erred when it denied him the forty-five day continuance he requested. The grant or denial of a continuance is a decision left to the sound discretion of the district court, and our review is limited to determining whether the district court abused its discretion.

-15-

United States v. Shaw, 920 F.2d 1225, 1230 (5th Cir. 1991); United States v. Martinez, 686 F.2d 334, 339 (5th Cir. 1982).

The district court did not abuse its discretion. The district court granted Camacho two continuances. Although the district court originally set the trial for May 6, the trial did not begin until June 24. Camacho's sole complaint is that when he requested a forty-five day continuance on June 12, the district court granted him only a seven-day continuance. Camacho contends that-- apparently sometime in early June--while he was reading the statement of facts from a brief filed in his capital murder appeal, he realized that there were several leads he needed to explore. He also alleges that he needed more time to investigate the events that occurred outside the State of Texas. Nevertheless, Camacho never explains what he might have discovered with the extra time.

Camacho also complains that, in the absence of a continuance, the government's late disclosure of Brady material also prejudiced him. Camacho, however, was able to interview the witnesses discovered through the Brady material, and they testified on his behalf at trial. Finally, Camacho argues that the district court denied the continuance for reasons of the judge's personal convenience. This last argument, however, misses the point. It does not matter why the district court denied the continuance. Instead, the question is whether the district court abused its discretion by unreasonably and arbitrarily insisting on an expeditious trial. United States v. Terrell, 754 F.2d 1139, 1149

(5th Cir. 1985). It did not. The district court granted the defendant two continuances, which gave him plenty of time to prepare for trial. Furthermore, the defendant has failed to show that he was materially prejudiced by the lack of preparation time.

E

Camacho next contends that the government committed reversible error when it violated the district court's pre-trial order requiring it to turn over all Brady material by the designated date. Specifically, he contends that the government failed to timely disclose: 1) the sworn affidavit of Mr. James Scott, a witness who had seen the kidnappers leave Wright's home and indicated that only three men were involved in the kidnapping of Evellyn and Andre Banks and that the driver of their automobile was black; 2) a report that a Dallas police officer prepared that indicated that only three men were involved in the kidnapping; 3) that the eyewitnesses, Mr. James Scott and Ms. Jane Wallace, had failed to identify Camacho as one of the kidnappers; and 4) that Ms. Rose Minter was improperly forced to identify Camacho.

To succeed on a Brady claim, the defendant must establish 1) the government suppressed the evidence, 2) the evidence favored him in some way, and 3) the evidence was material either to guilt or punishment. United States v. Ellender, 947 F.2d 748, 756 (5th Cir. 1991) (citing Smith v. Black, 904 F.2d 950, 963 (5th Cir. 1990)). "[T]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense,

-17-

the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  Ellender, 947 F.2d at 756 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

Camacho cannot show any prejudice from the government's failure to comply with the pretrial order.  The government provided Camacho with all of the alleged Brady material in sufficient time to incorporate it into his defense.  He had time to interview the witnesses and they testified on his behalf at trial.  Furthermore, the witnesses helped Camacho establish his alibi defense.  Indeed, nothing in the record suggests that Camacho would have done anything differently had the government given him the information earlier.  Accordingly, we reject Camacho's Brady claim.

F

Camacho's next complaint is that the district court erred when it permitted the government to introduce evidence of a another kidnapping in which both he and Jackson had participated because the evidence was allegedly insufficient to establish that a kidnapping had in fact occurred.  Our review of the district court's evidentiary rulings is deferential and, thus, we will only reverse when the trial court abused its discretion.  United States v. Anderson, 933 F.2d 1261, 1267-1268 (5th Cir. 1991).

The district court allowed the government to introduce the evidence under the conditional evidence rule.  Fed. R. Evid. 404(b).  Extrinsic evidence of other crimes is not admissible

unless a reasonable jury could find, by a preponderance of the evidence, that the defendant committed the offense. <u>Anderson</u>, 933 F.2d at 1269. The victim in the earlier crime, and several of Camacho's co-defendants as well, testified that the earlier kidnapping occurred. Based on this evidence, the district court found that a reasonable jury could conclude that Camacho and Jackson participated in the earlier kidnapping. Jackson's evidence suggesting that the crime never occurred only goes to the credibility of the witnesses. Credibility determinations belong to the finder of fact. Furthermore, the district court instructed the jury not to consider the evidence of the earlier kidnapping unless it believed beyond a reasonable doubt that the defendants participated in the crime. We, therefore, reject Camacho's argument that the evidence was insufficient to establish that a kidnapping had in fact occurred.

G

We have dealt with all of the defendants' trial complaints that relate to the verdict itself. We are now ready to discuss the defendants' arguments that relate to their sentences and the districts court's restitution awards.

(1)

Both defendants contend that the district court improperly sentenced them under the guideline for murder. The sentencing guideline for kidnapping provided, at the time of the instant offense, that "[i]f the victim was kidnapped, abducted or

unlawfully restrained to facilitate the commission of another offense: (A) increase [the base offense level of 24] by four levels; or (B) if the result of this guideline is less than that resulting from application of the guideline for such other offense, apply the guideline for such other offense." United States Sentencing Commission, Guidelines Manual, § 2A4.1(b)(5) (Nov. 1990). Here, the district court concluded that the defendants kidnapped Evellyn and Andre Banks to facilitate their murders. Accordingly, it sentenced them under the guideline for murder.

A district court can determine a criminal defendant's sentence based both on facts that the government proved at trial beyond a reasonable doubt and on facts it believes the government has proven by a preponderance of the evidence. United States v. Casto, 889 F.2d 562, 570 (5th Cir. 1989). While we review application of the guidelines to facts for clear error, questions concerning the interpretation of the guidelines are questions of law subject to de novo review. United States v. Shano, 955 F.2d 291 (5th Cir. 1992); see also 18 U.S.C. § 3742(e).

It is true that the jury found Jackson and Camacho guilty only of kidnapping. As we note above, however, under the guidelines if the defendant kidnaps the victim "to facilitate the commission of another offense," the defendant can be sentence under the guideline for the other offense. U.S.S.G. § 2A4.1; see also United States v. Galloway, 963 F.2d 1388, 1391 (10th Cir. 1992) (The government convicted the defendant of kidnapping and then sentenced him under

the guideline for sexual abuse); <u>United States v. DePew</u>, 932 F.2d 324 (4th Cir. 1991) (The government convicted the defendant of kidnapping and sentenced him under the guideline for murder.)

With respect to Camacho, the district court's conclusion that he kidnapped the victims to facilitate their murders is easily supported by the facts. As noted above, Camacho knew from the beginning that collecting the debt from Wright might require him to kidnap Evellyn and Andre Banks. While at Wright's house, he killed David Wilburn, and Evellyn and Andre witnessed the murder. It then became necessary to cover up the murder. Thus, Wilburn's death gave Camacho an additional reason for kidnapping the victims: eliminating the witnesses to the murder. Indeed, shortly after murdering Wilburn, Camacho ordered Jackson to shoot Wright, which suggests that collecting a debt from Wright had ceased to be the immediate objective of the kidnapping. Furthermore, he did not even attempt to ransom the victims. All of this evidence strongly supports the district court's conclusion that at least one of the reasons Camacho kidnapped the victims was to murder them.

We now turn to Jackson's sentence. The following established facts bear directly on Jackson's sentence. Jackson fully participated in the kidnapping of Evellyn and Andre Banks. He was an accomplice to Camacho when Camacho killed Mr. Wilburn. He knew that Evellyn and Andre had witnessed the murder. When Camacho ordered Jackson to shoot Wright, Jackson was on notice that collecting the debt had, at best, faded as the immediate motive for

-21-

the kidnapping.  He knew that now there were new reasons for the kidnapping and that, as an accomplice to the Wilburn murder, he had virtually as much to gain as Camacho from the elimination of the witnesses.  The district court found that a reasonable person in Jackson's situation would have known that the other kidnappers were going to kill Evellyn and Andre Banks once they witnessed the murder of David Wilburn.  The district court thus concluded that Jackson participated in the kidnapping of the victims to facilitate their murder.  This finding is not clearly erroneous.

(2)

Jackson also contends that the district court erroneously believed that it was without authority to make a downward adjustment in his sentence.  This argument is based on the district court's comments during sentencing that it regretted imposing the same sentence on both Jackson and Camacho when Jackson was less culpable.  Contrary to Jackson's contention, the district court did recognize its ability to make a downward departure in Jackson's sentence but found no facts upon which to base such a departure.  We will uphold the district court's refusal to depart from the guidelines unless the refusal was in violation of the law.  United States v. Buenrostro, 868 F.2d 135, 139 (5th Cir. 1989).  The district court's conclusions are not in violation of law.

(3)

We now turn to the defendants' contention that the district court erred in ordering Jackson and Camacho to pay restitution to

the estate of Evellyn Banks. The court ordered Jackson to pay $250,000 in restitution and ordered Camacho to pay $1,000,000 in restitution. Recognizing that this was a highly publicized case, the court reasoned that the defendants might someday receive income from a book or movie concerning the kidnapping. The court concluded that the victims of the crime should benefit from such income before the defendants.

The defendants argue that the statute does not authorize the restitution order and that the order is inconsistent with the First Amendment and, therefore, unconstitutional. See Simon & Schuster, Inc. v. Members of the New York State Crimes Bd., ___ U.S. ___, 112 S.Ct. 501 (1991).

The district court made the orders pursuant to the Victim and Witness Protection Act, 18 U.S.C. § 3663. The statute provides that the court may order the defendant:

> (2) in the case of an offense resulting in bodily injury to the victim--
> (C) reimburse the victim for income lost by such victim as a result of such offense;
> (3) in the case of an offense resulting in bodily injury also results in the death of a victim, pay an amount equal to the cost of necessary funeral and related services . . .

The statute grants the district court wide discretion in determining the appropriate amount of restitution. United States v. Anglian, 784 F.2d 765 (6th Cir. 1986). The district court has the authority to award restitution in an amount greater than that alleged in the indictment even if the defendant is unable to pay

the amount of restitution when the court awards it.  <u>United States v. Pomazi</u>, 851 F.2d 244, 249 (9th Cir. 1988); <u>see</u> <u>also</u> <u>United States v. Ryan</u>, 874 F.2d 1052, 1054 (5th Cir. 1989) (The court can award restitution even when the defendant is indigent at the time the award is made.)

In this case, the district court has the authority to order the defendants to pay the victims' estates an amount equal to victims' lost income and the victims' funeral expenses. Nevertheless, the amount of the restitution must be supported by the evidence and related to the victim's losses.  <u>Pamazi</u> 851 F.2d at 249; <u>United States v. Hill</u>, 798 F.2d 402, 406 (10th Cir. 1986). In this case, the district court did not make any factual findings concerning the amount of the victims' losses.  In fact, the award appears to be related to the defendants' income instead of the victims losses.  We, therefore, must set aside the district court's restitution order and remand to the district court for factual determinations that are supported by a preponderance of the evidence.

Finally, the district court's award must take into account certain constitutional rights of the defendant as noted in <u>Simon & Schuster</u>.  <u>Simon & Schuster</u> concerned a New York restitution law that sought to take the money criminals earned on books and movies associated with their illegal activities and to direct it to the victims of the crimes they committed.  The Court held that the law unconstitutionally imposed a financial burden on criminals because

of the content of their speech.  The Court recognized that New York had a powerful interest in compensating the victims of crime, but held that the New York law was not narrowly tailored to meet that objective.  Simon & Schuster, 112 S.Ct. at 512.  Under the Supreme Court's holding in Simon & Schuster, the district court cannot limit a restitution order solely to the income the defendants earn on speech associated with their criminal activities.

IV

We summarize our holdings as follows:  We AFFIRM the convictions of both Jackson and Camacho.  We also AFFIRM the sentences the district court gave both Jackson and Camacho. Finally, we REVERSE the restitution orders for both Jackson and Camacho and REMAND to the district court for proceedings not inconsistent with this opinion.

> AFFIRMED in part, REVERSED in part, and
> REMANDED.